```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF NEW JERSEY
```

```
JOHN F. SCHIERECK,

          Plaintiff,

     v.                          HONORABLE JOSEPH E. IRENAS

TOWNSHIP OF MULLICA et al.,      CIVIL ACTION NO. 06-1674
                                        (JEI / JS)
          Defendants.
                                           OPINION
```

**APPEARANCES:**

JOHN F. SCHIERECK
3645 Nesco Road
Nesco, NJ 08037
    Plaintiff, *pro se*

BARKER, SCOTT & GELFAND
By:  A. Michael Barker, Esq.
     Joseph M. Scott, Esq.
Linwood Greene
210 New Road, Suite 12
Linwood, NJ 08221
    Counsel for All Defendants

REYNOLDS, DRAKE, WRIGHT & MARCZYK
By:  Thomas B. Reynolds, Esq.
29 North Shore Road
Absecon, NJ 08201
    Counsel for Defendant Cpl. Paul Register

GEMMEL, TODD & MERENICH, P.A.
By:  Robert P. Merenich, Esq.
767 Shore Road
PO Box 296
Linwood, NJ 08221
    Counsel for Defendant Sgt. Joseph Barbera

**IRENAS,** Senior District Judge:

This § 1983 suit arises out of Plaintiff's altercation with Mullica Township police, and subsequent arrest and prosecution for disorderly conduct.  Before the Court are Defendants' presently unopposed Motions for Summary Judgment.[1]  For the reasons set forth below, the Motions will be granted; however, the Court will provide Plaintiff 75 days within which to locate a new attorney and file a motion to vacate the judgment.

**I.**

Plaintiff's claims arise out of an incident occurring during the third of three separate visits Mullica Township police made to Plaintiff's residence on September 22, 2004.

The first encounter occurred at approximately 1:18 p.m. (Scott Cert. Ex. 3)  Police Officer Anthony Trivelli (who is not a Defendant to this suit) arrived at Plaintiff's house with Plaintiff's girlfriend, Theresa Ann Heath Logan, "in reference to a domestic stand-by."  (Id.)  It is undisputed that Plaintiff and Logan were having a disagreement over her personal belongings. Logan came with Trivelli in order to retrieve her property from Plaintiff's house.  (Id.; Pl's Dep. at p. 86-89)  Plaintiff acknowledges that he and Officer Trivelli had a verbal

---

[1] The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

"argument" but "[n]othing transpired from that incident." (Pl's Dep. at p. 89)

The second encounter occurred at approximately 7:21 p.m. (Scott Cert. Ex. 4) Defendant Officer Joseph Barbera responded to a call "in reference to a harassment complaint." (Id.) The record does not indicate who made the complaint. Plaintiff admits that he had an "argument" with Barbera, generally relating to Plaintiff's tumultous relationship with Logan,[2] who was not at Plaintiff's residence at the time. (Pl's Dep. at p. 102) Barbera's police report, which is not contradicted by Plaintiff's testimony, states the following:

> Mr. Schiereck became more enraged, walking in and out of [his] residence yelling obscenities at the undersigned. He approached the undersigned several times trying to provoke some type of altercation . . . The undersigned never exited the police unit, and at one point Mr. Schiereck approached the undersigned, handed me his house phone, and advised me that an F.B.I. agent wanted to speak with me. On the phone was a sheriff's officer, a friend of Mr. Schierick's who obviously did not want to be brought into this incident. After I finished speaking with this subject, I attempted to hand the phone back to Mr. Schiereck, when Mr. Schiereck ripped the phone from my hand in a violent manner, threw the phone up against the 2nd floor of his residence, shattering it into pieces, and again began to verbally yell obscenities at the undersigned. At this time, the undersigned advised Mr. Schiereck's son that his father was advised of his options, and the undersigned left the property.

---

[2] Logan testified that criminal charges were brought against Plaintiff at least two times in the past for "beating [her] up real bad." (Logan Dep. at p. 5) She testified that she had a "temporary restraining order" against him at some unspecified time. (Id.)

3

(Scott Cert. Ex. 4)  Plaintiff admits that he threw his phone against his house because he was "disgusted with [Barbera's] attitude."  (Pl's Dep. at p. 103)

The last encounter, which ended with Plaintiff's arrest, began around 8:14 p.m.  (Scott Cert. Exs. 4, 5)  Dispatch advised Barbera that "Mrs. Schierick" had called about an "unknown problem" at Plaintiff's residence.  (Scott Cert. Ex. 4)  Barbera, believing that the person identifying herself as Mrs. Schierick was "possibly" Plaintiff's girlfriend Logan,[3] radioed Defendant Officer Paul Register to also respond to the scene.  (Id.)  Barbera reports that he asked Register to respond because Barbera had "prior knowledge of domestic assaults at this residence." (Id.)

Register was the first to arrive at Plaintiff's house; Barbera arrived shortly thereafter.  (Scott Cert. Exs. 4, 5; Pl's Dep. at p. 109-10)  Plaintiff was inside his house when they arrived, while a few friends were grilling food on his front porch.  (Pl's Dep. at p. 110-11)  Plaintiff's adult son was speaking with Register when Plaintiff came out of the house. (Scott Cert. Ex. 4, 5; Pl's Dep. at p. 111-12)  The undisputed record indicates that Plaintiff's son informed Register that "his

---

[3]  The undisputed record indicates that the caller was actually Plaintiff's mother, Mrs. Joyce Schiereck, who called the police after her telephone conversation with her son was abruptly cut-off.  (Joyce Schiereck Dep. at p. 79) She testified that she was concerned for her son's health because he had recently suffered a heart attack.  (Id. at p. 79-80)

father was a bit out of control earlier but everything was okay."
(Register Dep. at p. 30)[4]

According to Plaintiff, when he came out of his house, Register was "pretty much in my face and yelling at me." (Pl's Dep. at p. 113) Plaintiff repeatedly asked the officers to leave his property and then turned to go back into his house. (Pl's Dep. at p. 115) He described what happened next:

> [A]s I was walking, [Register] told [me] to-- where the "F" are you going, turn around, I'm talking to you and you dirtbag lowlife, just on and on and on.
> And with that I turned around and said, just fucking leave, just leave, you have no right to be here, something in the sense of those words.
> And with that, I went up, started to get up . . . on my deck. . . .
> . . . I have a [railing] on my house where it goes around the deck. I kicked [part of the railing] and broke it. . . . and a chunk of wood went over to at least 20 feet past the [police] cars, to the left. . . . I was pissed. . . . I kicked [the wood]. And my hands were probably in the air. . . . [I was] unbelievably mad.
> [Then] I came down [off the deck], and I got within two feet face-to-face with [Register]. I told him to get in his F'ing car and leave, there was no reason for him to be there . . . He said enough downgrading to me, that I didn't want to hear it anymore. . . .
> I pointed a finger at him. . . . I said get in your fucking car.

(Pl's Dep. at p. 115-19) According to Plaintiff, "that's when Paul Register lost it," and put Plaintiff in a headlock. (Id. at p. 119-21) Plaintiff explains,

---

[4] It does not appear that Plaintiff's son was ever deposed. The record indicates that Plaintiff's son served in the military and was only visiting Plaintiff for a period of a few weeks. (Pl's Dep. at p. 82)

5

> It was very abrupt, that when we were standing face-to-face, that [Register] had grabbed me in a disorderly fashion and put me into a headlock . . . . I wasn't backing down and he wasn't so he took it upon himself to just act in the way that he did. . . . He had me in a headlock with his right hand . . . and was bouncing me. . . . I mean it was nothing for him to lift me. The guy was huge.

(Pl's Dep. at 393-98)  Plaintiff testified that Register lifted him up off the ground about six inches to a foot approximately two to three times while in a headlock.  (Id. at p. 399-400)  Then Plaintiff briefly lost consciousness.  (Id. at p. 400)  Shortly thereafter Plaintiff was handcuffed.  (Id. at p. 122-23)  Plaintiff asserts that his neck was fractured as a result of Register's actions, but his medical records affirmatively state that he suffered no fractures.  (Scott Cert. Ex. 31, Report of X-Ray taken on September 23, 2004)

Plaintiff testified that the verbal confrontation between himself and Register lasted approximately four to six minutes, and the physical confrontation lasted approximately 30 to 40 seconds.  (Pl's Dep. at p. 389, 125)  Plaintiff further testified that Barbera was not involved in any way in the incident.  Indeed, Plaintiff faults Barbera for not intervening to prevent the situation from escalating.  (Pl's Dep. at 118)[5]

---

[5] *See also* Pl's Dep. at p. 185 ("[Barbera] could have calmed the situation and he didn't. And that's the only thing-- downfall I have with him."); p. 320-21 ("Q: Did Sergeant Barbera assault you on September 22nd, '04?; A: No, he did not. . . . He had no physical contact with me. . . . Q: Did . . . Sergeant Barbera do any of those things that you just said that Officer Register did?; A: No, sir. He's very professional. . . .")

Register's report states that Plaintiff threw pieces of the broken deck railing at the police cars, after cursing at and making unspecified "threats" to the officers. (Scott Cert. Ex. 5)  The report further states that Plaintiff "advanced toward [Register] at a quick pace with fists clenched," and ignored Register's orders to go back into the house, at which point Register informed Plaintiff that he was under arrest. (Id.)  Register reports that he resorted to a "compliance hold" to gain control of Plaintiff when he would not cooperate with being handcuffed. (Scott Cert. Exs. 5, 6)  Register admits that he initiated the physical contact with Plaintiff, not the other way around. (Register Dep. at 41)  Both Register and Barbera reported that they smelled alcohol on Plaintiff's breath after the arrest (Scott Cert. Ex. 4, 5), although Plaintiff states that he only had two beers at around 11 a.m. that day. (Pl's Dep. at p. 92)[6]

Plaintiff was arrested for, and charged with, disorderly conduct in violation of N.J.S.A. 2C:33-2a.(1).  Plaintiff was acquitted of the charge in Egg Harbor Township Municipal Court.[7]

---

[6] Notably, Mullica Township Police Department's "Arrest Detail Report" lists Plaintiff's condition as "apparently normal." (Scott Cert. Ex. 7)

[7] There is very little evidence of this fact in the summary judgment record, undoubtedly due, in part, to the fact that Plaintiff has not submitted opposition to the present motions.  However, an affidavit signed by Plaintiff's former attorney in this case, Ms. Appenzeller, (submitted in support of her motion to withdraw as counsel) states that Appenzeller represented him in the criminal matter and that Plaintiff was acquitted of the charges.

7

This suit followed. Against Register and Barbera, the Complaint alleges false arrest, false imprisonment, malicious prosecution, and use of excessive force, all in violation of the Fourth Amendment to the United States Constitution (as incorporated by the Fourteenth Amendment). The Complaint also alleges assault and battery and malicious prosecution claims against Register and Barbera under New Jersey State law.[8]

Lastly, the Complaint alleges that Mullica Township aided and abetted Register and Barbera's torts and failed to adequately screen, train, or supervise Register and Barbera.

## II.

This case has taken a somewhat unusual course in the last year and a half. Because the surrounding circumstances bear on the appropriate disposition of the instant motions, the Court briefly departs from its usual summary judgment analysis to make the following observations.

The able law firm of Jacobs & Barbone, P.A., on Plaintiff's behalf, drafted the instant Complaint and filed it in New Jersey state court. The case was timely and properly removed to this Court on April 10, 2006. The subsequent docket entries suggest no unusual occurrences for the remainder of 2006 and most of

---

[8] Plaintiff complied with the notice provisions of the New Jersey Tort Claims Act, N.J.S.A. 59:1-2 et seq. (Scott Cert. Ex. 11)

2007.  It appears that the parties were engaging in discovery during this time.

The first indication of anything out of the ordinary appears in Magistrate Schneider's Amended Scheduling Order of February 4, 2008.  That order directs Plaintiff's counsel to file a motion to withdraw as attorney by March 11, 2008, and sets oral argument on the motion for April 21, 2008.  It is unclear what prior communications gave rise to the order.  Nothing in the record or on the docket suggests that by this time, the parties had not completed discovery, which, according to the operative scheduling order, should have been completed by October 31st of the prior year.  Indeed, the parties were just weeks away from the dispositive motion deadline of March 17, 2008 when the motion to withdraw was presented to Magistrate Schneider.

Subsequent communications with Magistrate Schneider, and the materials submitted in support of the motion to withdraw, indicate that Plaintiff's relationship with Jacobs & Barbone, who had been representing Plaintiff for almost three and a half years,[9] had recently deteriorated beyond repair.  Magistrate Schneider granted the motion to withdraw on April 9, 2008.

The order granting the motion directed Plaintiff to obtain new counsel who must enter an appearance by June 9, 2008, or else

---

[9] As noted at *supra,* n.7, Jacobs & Barbone represented Plaintiff in the criminal case giving rise to this suit.

Plaintiff would be deemed to be proceeding *pro se*. The order also held in abeyance, until further order of the Court, the dispositive motion deadline. (No dispositive motions were filed prior to the order.) Finally, Magistrate Schneider set the next status conference for a week after Plaintiff's deadline to retain new counsel. On June 13, 2008, the status conference was rescheduled to August 15, 2008, apparently in response to a communication from Plaintiff.

Over the course of the summer of 2008, Plaintiff apparently sought representation from at least two attorneys, but to no avail. Simultaneously, Plaintiff, on his own, was attempting to obtain various documents and transcripts from defense counsel. In response to Plaintiff's discovery attempts, Magistrate Schneider ordered defense counsel to appear in Court with various materials so that Plaintiff would have an opportunity to review and duplicate the materials he sought, should they exist. It is not clear whether the in-court document review and exchange between Plaintiff and Defendants ever occurred. On August 28, 2008, Magistrate Schneider formally extended the discovery deadline to September 30, 2008, and the dispositive motion deadline to November 3, 2008.

Six days before the discovery deadline, Plaintiff wrote to Magistrate Schneider asking for "a couple more months" to find an attorney to represent him. Magistrate Schneider denied that

request, noting that Plaintiff was already given five and a half months to find an attorney.

Defendant Register filed his Motion for Summary Judgment on October 2, 2008.  Defendants Barbera and Mullica Township filed their Motions for Summary Judgment on November 3, 2008.  Plaintiff has never responded directly to the motions.  However, since the motions were filed, Plaintiff has written Magistrate Schneider two somewhat rambling letters, which mostly do not address the merits of this case, but do make clear that Plaintiff does not intend to abandon his case.  Moreover, Plaintiff feels strongly that he has been the victim of a legal wrong and that Defendants are concealing documents (and perhaps other information) which would support Plaintiff's case.

Against this historical background, the Court now turns to the Motions for Summary Judgment.

**III.**

Because Plaintiff is at least presently proceeding *pro se*, the Court is mindful of "its obligation to construe liberally *pro se* submissions to ensure that rules of pleading, sometimes thorns in the side of the most studied practitioner, do not subvert a litigant's opportunity for judicial remediation of wrongful conduct."  *Metsopulos v. Runyon*, 918 F. Supp. 851, 857 (D.N.J. 1996).  The Court's leniency in this regard notwithstanding,

11

claims "lack[ing] procedural or factual viability" are not immune from summary judgment just because a plaintiff represents himself.  *Id.*  In opposition to a motion for summary judgment, "a *pro se* plaintiff is not relieved of the burden to submit evidence" which at least raises a material issue of fact requiring resolution by a factfinder.  *Pollen v. Comer*, 2008 U.S. Dist. LEXIS 18527 at * 20 (D.N.J. Mar. 10, 2008).  As with all motions for summary judgment, a non-moving party who bears the burden of proof at trial must put forth evidence to support his claims.  *See Conoshenti v. Public Serv. Elec. & Gas,* 364 F.3d 135, 145-46 (3d Cir. 2004).

Accordingly, even affording Plaintiff's submissions liberal interpretation, and of course, viewing the present record in the light most favorable to him and drawing all inferences in his favor,[10] the Court finds the record evidence insufficient to support Plaintiff's claims as a matter of law.  Defendants are therefore entitled to summary judgment and their motions must be granted.

However, the Court does not disregard out-of-hand Plaintiff's assertions that he firmly believes he is the victim in this case.  Plaintiff admits that he lacks the knowledge that would enable him to articulate a legally rational basis for

---

[10]  *See generally Pollock v. Am. Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir. 1986).

12

denying Defendants' motions.  Moreover, while the Court has no factual basis to believe that defense counsel has deliberately disobeyed court orders or failed to comply with their discovery obligations,[11] the Court is loathe to finally dismiss this case (due to lack of evidence supporting Plaintiff's claims) when Plaintiff would, with the assistance of counsel, be better able to articulate what evidence he believes he is entitled to but has not received.

Under the Federal Rules of Civil Procedure and governing case law, Defendants are entitled to summary judgment and the Court may not decline to enter judgment in their favor.  But the Court will allow Plaintiff 75 days from the date of the judgment to retain an attorney[12] and file a motion to vacate the judgment pursuant to Fed. R. Civ. P. 60(b).[13]  If such a motion is filed, Plaintiff's attorney must attach the papers he or she proposes to submit in opposition to the Motions for Summary Judgment in the event the Court vacates the judgment that will be entered today.

---

[11]  As noted above, Magistrate Schneider presided over the discovery in this case.  The Court has no opinion, good or bad, regarding any attorney's, or party's, conduct with regard to discovery in this case.

[12]  Plaintiff's most recent correspondence with Magistrate Schneider suggests that Plaintiff is having financial difficulties.  Plaintiff may wish to inquire about free legal assistance by contacting Legal Services of New Jersey or the New Jersey State Bar Association.

[13]  To be clear, the Court only grants leave for Plaintiff's attorney, should he retain one, to file a Rule 60(b) motion.  Nothing in this Opinion should be construed as implying that the motion would be either granted or denied.

**IV.**

For the above-stated reasons, Defendants' Motions for Summary Judgment will be granted.  Should Plaintiff retain an attorney, that attorney may file a motion to vacate the judgment within 75 days of the date of the judgment.  An appropriate order will be issued.


May 27, 2009                              s/ Joseph E. Irenas
                                     **JOSEPH E. IRENAS, S.U.S.D.J.**